# Supreme Court of Florida

_____

No. SC12-2075
_____

**WILLIAM P. AUBIN,**
Petitioner,

vs.

**UNION CARBIDE CORPORATION,**
Respondent.

[October 29, 2015]

PARIENTE, J.

William P. Aubin contracted peritoneal mesothelioma—an incurable, terminal disease—which he claimed was caused by his exposure to SG-210 Calidria, an asbestos product designed and manufactured by Union Carbide Corporation. The jury returned a verdict for Aubin and determined that Union Carbide was liable for Aubin's damages, in part, under theories of both negligence and strict liability defective design and failure to warn.

In Union Carbide Corp. v. Aubin, 97 So. 3d 886 (Fla. 3d DCA 2012), the Third District Court of Appeal reversed the jury verdict and $6,624,150 judgment in Aubin's favor, after making three key holdings: (1) the trial court erred in failing

to apply the Restatement (Third) of Torts ("Third Restatement"), which exclusively adopts the "risk utility" test for a design defect claim and imposes on plaintiffs the requirement of proving a reasonable alternative design; (2) the design defect was not a cause of Aubin's damages; and (3) the jury instructions given by the trial court regarding the failure to warn were misleading because they failed to discuss Union Carbide's learned intermediary defense—a doctrine setting forth the circumstances under which a manufacturer could discharge its duty to warn the end user by reasonably relying on an intermediary, who has received and has knowledge of the extent of the danger.[1] The Third District's decision creates multiple points of express and direct conflict with decisions of this Court and of other district courts of appeal.[2]

First, in applying the Third Restatement to strict products liability cases, the Third District's decision in Aubin conflicts with our holding in West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), and with the Fourth District Court of

_____

1. As addressed in this opinion, the learned intermediary doctrine focuses on numerous factors to determine whether a manufacturer can discharge its duty to warn by relying on an intermediary. As set forth in the Second Restatement, the "question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it." Restatement (Second) of Torts § 388 cmt. n (1965).

2. Based on these conflicts, we have jurisdiction. See art. V, § 3(b)(3), Fla. Const.

Appeal's decision in <u>McConnell v. Union Carbide Corp.</u>, 937 So. 2d 148 (Fla. 4th DCA 2006), both of which applied the Restatement (Second) of Torts ("Second Restatement") to strict products liability cases and utilized the "consumer expectations" test as an essential part of determining a design defect. Resolving this conflict in the law, we conclude that the definition of design defect first enunciated in <u>West</u>, which utilizes the consumer expectations test, instead of utilizing the risk utility test and requiring proof of a reasonable alternative design, best vindicates the purposes underlying the doctrine of strict liability.[3] We thus disapprove of the Third District's adoption of the risk utility test for design defects, as enunciated in the Third Restatement.

Second, in determining that Aubin failed to show that the asbestos designed and manufactured by Union Carbide was the legal cause of Aubin's mesothelioma, the Third District erroneously merged the Third Restatement's definition of design defect with causation, which again creates a conflict as the Third Restatement's

---

3. The Third District stands alone among the district courts of appeal in having adopted the Third Restatement and its requirement that the plaintiff establish a reasonable alternative design, despite this Court's precedent. In fact, the Third District has even held that the jury should be instructed only on the risk utility test, although this is contrary to both Florida's Standard Jury Instructions and decisions from this Court. <u>Compare</u> <u>Agrofollajes, S.A. v. E.I. Du Pont de Nemours & Co.</u>, 48 So. 3d 976, 997 (Fla. 3d DCA 2010) (holding that courts should not instruct juries on the consumer expectations test), <u>with</u> <u>In re Std. Jury Instr. in Civ. Cases—Report No. 13-01</u>, 160 So. 3d 869, 871 (Fla. 2015) (approving jury instructions on the consumer expectations test).

- 3 -

definition of a design defect is different than the definition Florida courts have previously used. After applying a proper legal analysis, we conclude that Aubin did present sufficient evidence of causation, and thus the determination of legal causation was properly a jury question based on conflicting evidence. We accordingly further disapprove that aspect of the Third District's opinion, including the conclusion that Union Carbide was entitled to a directed verdict on the design defect claim.

Finally, in reversing the judgment for the failure to warn claim based on the failure to instruct the jury on the learned intermediary defense, the Third District's decision conflicts with the portion of McConnell that holds that the learned intermediary defense is not applicable in this type of asbestos case. See McConnell, 937 So. 2d at 156. Although we approve the Third District's holding that the jury could be instructed on the learned intermediary doctrine, we conclude that this issue does not require reversal of the verdict because, while Union Carbide could argue that the learned intermediary defense is applicable to this type of case, it failed to submit proposed jury instructions that accurately discussed the defense. Therefore, the trial court did not err in failing to give Union Carbide's proposed special jury instructions. In looking to the jury instructions as a whole, we conclude that the trial court's instructions were not so misleading as to require a reversal.

Accordingly, we quash the decision of the Third District in <u>Aubin</u> and disapprove adopting the Third Restatement's approach, which uses the risk utility test, instead of the consumer expectations test, and requires plaintiffs to establish a reasonable alternative of how a product could have been designed. We also disapprove of the Third District's prior cases of <u>Kohler Co. v. Marcotte</u>, 907 So. 2d 596 (Fla. 3d DCA 2005), and <u>Agrofollajes, S.A. v. E.I. Du Pont de Nemours & Co.</u>, 48 So. 3d 976 (Fla. 3d DCA 2010), as to the adoption of the Third Restatement. As to the failure to warn claim, we agree with the Third District's discussion of the learned intermediary defense, which is in accordance with the Fourth District's decision in <u>Union Carbide Corp. v. Kavanaugh</u>, 879 So. 2d 42, 44-45 (Fla. 4th DCA 2004). To the extent that the Fourth District's opinion in <u>McConnell</u> holds that the learned intermediary defense is not applicable in asbestos cases, we disapprove that portion of <u>McConnell</u>. As the Third District erroneously reversed the final judgment, we remand this case to the Third District with directions that the judgment be reinstated.

## FACTS

William P. Aubin worked as a construction supervisor for his father's company between 1972 and 1974, overseeing construction of the residential development Desoto Lakes in Sarasota, Florida. While at work on the construction site, Aubin was exposed to and inhaled respirable dust created by the sanding and

sweeping of drywall joint compounds and spraying of ceiling texture sprays. Aubin did not know that these joint compounds and texture sprays contained asbestos and thus did not know that he was inhaling asbestos fibers. In 2008, Aubin was diagnosed with malignant peritoneal mesothelioma, which is a fatal, incurable form of cancer in the lining of the abdomen.

Aubin filed suit against numerous defendants, including Union Carbide, alleging that his disease was caused by asbestos in joint compounds and texture sprays designed, manufactured, and sold by third parties (such as Georgia-Pacific) that contained asbestos supplied by Union Carbide. After resolving his claims against the other defendants through settlement or dismissal, Aubin went to trial solely against Union Carbide on theories of strict liability design defect, strict liability failure to warn, and negligent failure to warn.

The evidence showed that Union Carbide began mining a naturally occurring, unique short fiber form of chrysotile asbestos in 1963 from a deposit in California. After removing the asbestos from the ground, Union Carbide passed it through a centrifuge multiple times to separate the fibers, a process that caused the asbestos to become more efficient as a thickening agent. Union Carbide then formed the asbestos into pellets to reduce dust, packaged it in bags, and sold it in bulk under the trade name SG-210 Calidria for use in many products, including joint compounds and texture sprays.

Union Carbide's asbestos was 99.9% pure in comparison to competitors' asbestos that contained filler. In its marketing literature to manufacturers of products such as the joint compounds and texture sprays at issue, Union Carbide focused on its asbestos's purity and natural properties. For example, a 1971 Union Carbide report explained the "Special Properties of 'Calidria' Asbestos" as follows:

> Most asbestos materials, marketed commercially for use in tape joint compounds, contain rock dust and other abrasive type fillers, that have no specific desirable effects on joint compound performance. "Calidria" SG-210 and SG-130 asbestos are produced by a proprietary manufacturing process that yields essentially a pure asbestos fiber content. The SG-210 product is preferred for ready-mix smoothness and water absorption efficiency. Another feature is the unique shape and physical structure of the "Calidria" asbestos fibers. The micro-size particles are actually "fibrils" and the respective stems are hollow; hence, the fibers have a tremendous water absorption capacity. In like manner, there are more "active sites" for other inert fillers to associate with, in formulated film formation. As a result "Calidria" asbestos generally goes twice as far, on a pound for pound basis, as the Canadian and other commercial types used in tape joint compounds. It is these physical properties that enhance the wet joint compound workability and performance properties mentioned above.

While Union Carbide specifically marketed its product to intermediary manufacturers for use of the asbestos in products such as joint compounds, Union Carbide was not involved in the formulation, packaging, or sale of the end products. The intermediary manufacturers combined the asbestos with other ingredients to make end products. However, as the literature from Union Carbide recognized, SG-210 Calidria was a specially designed product subjected to a

propriety processing method, in contrast to being more akin to a basic, raw product

such as sand.  As explained by the Third District regarding the design of SG-210

Calidria:

> The evidence established that SG-210 Calidria was chrysotile
> asbestos that had been subjected to Union Carbide's carefully
> designed asbestos processing regimen.  During this process, the
> chrysotile asbestos was placed through a centrifuge multiple times in
> order to separate the chrysotile fibers and thereby increase the
> efficiency of the asbestos when added to water.  As a direct result of
> this process, Union Carbide, in its marketing literature, proclaimed
> that "Calidria asbestos generally goes twice as far, on a pound for
> pound basis, as . . . other commercial types used in tape joint
> compounds."

Aubin, 97 So. 3d at 896.

Conflicting evidence was presented at trial as to whether Union Carbide

properly warned its intermediary manufacturers—as well as the designers,

manufacturers, and sellers of the joint compounds and texture sprays at issue—

about the then-known dangers of its product or whether Union Carbide engaged in

a misinformation campaign, concealed the truth about the dangers of asbestos from

its customers, and did not put warning labels on its asbestos bags.  Further,

evidence was presented that showed Union Carbide was aware of numerous

dangers of its product.

Union Carbide's 1964 "Asbestos Toxicology Report" acknowledged that

workers exposed to high concentrations of asbestos dust "were prone to develop

. . . asbestosis."  A 1967 report, known as the Sayers Report, recognized that even

a brief exposure to asbestos dust could produce mesothelioma.  In 1969, Union

Carbide updated its toxicology report to note that "[a] type of cancer named

mesothelioma . . . has been noted to be associated with asbestos exposure in recent

years" and that mesothelioma "may occur in individuals with histories of only

slight exposures."  However, the 1969 report also reflected the then-accepted view

that exposure below a certain number of particles per cubic foot of air would not

result in disease and recommended the use of respirators where those limits would

be exceeded.

In 1972, the Occupational Safety and Health Administration (OSHA)

mandated the following warning for asbestos and certain asbestos-containing

products, and Union Carbide began placing this new warning on the bags of

asbestos it sold:

CAUTION
Contains Asbestos Fibers
Avoid Creating Dust
Breathing Asbestos May Cause
Serious Bodily Harm

Evidence showed that OSHA limits for occupational exposure indicated that no

mask needed to be worn where one's exposure to asbestos did not exceed five

fibers that were greater than five microns in length per milliliter of air.  Testimony

at trial demonstrated that nearly all of Union Carbide's SG-210 Calidria asbestos

was less than five microns in length.  However, there was also evidence that Union

Carbide had commissioned a study on rats that showed that short asbestos fibers—like those in Union Carbide's SG-210 Calidria asbestos—were actually more dangerous than longer fibers in increasing the risk of producing tumors.

The Third District correctly explained the factual disputes in this case on Union Carbide's failure to warn the end user:

> As is detailed below, there was sufficient evidence presented at trial to create factual questions to be resolved by the jury regarding: whether Union Carbide warned the intermediary manufacturers; whether the alleged warnings to the intermediary manufacturers were adequate; the actual degree of dangerousness of SG-210 Calidria with respect to the contraction of mesothelioma; whether it was feasible or unduly burdensome for Union Carbide to warn end users directly; and each intermediary manufacturer's degree of education, knowledge, expertise, and relationship with the end users. For example, although Union Carbide presented evidence that it regularly apprised the intermediary manufacturers of the dangers associated with asbestos by providing them with the latest scientific reports and studies, Aubin presented evidence that Union Carbide misled the intermediary manufacturers into thinking SG-210 Calidria was safe. And although Union Carbide claimed that it began placing warnings on its asbestos bags in 1968, a Georgia-Pacific representative called by Aubin testified that he did not recall such labels on Union Carbide's bags of asbestos. Further, while Aubin challenged the adequacy of the OSHA warnings, he testified at trial that if he had seen Union Carbide's OSHA warning, he "more than certainly" would have taken steps to protect himself from the hazards of asbestos. In addition, while Aubin presented expert testimony attributing his contraction of mesothelioma to his exposure to SG-210 Calidria, Union Carbide presented expert testimony that it was relatively unlikely, if not impossible, that Aubin contracted peritoneal mesothelioma from exposure to chrysotile asbestos. Lastly, although Aubin claimed that it would have been feasible for Union Carbide to warn end users directly, or to contractually require intermediary manufacturers to warn end users, Union Carbide offered the testimony of Jack Walsh, a Union Carbide sales representative, who testified that

- 10 -

Union Carbide did not sell directly to consumers; claimed Union Carbide had no way of identifying the end users; attested to the fact that Union Carbide was not involved in how the intermediary manufacturers designed, distributed, or packaged their products; and contended that Union Carbide was incapable of requiring intermediary manufacturers to place warnings on products containing Union Carbide's asbestos.

Aubin, 97 So. 3d at 901.

Aubin testified that he never wore any kind of protective device and did not recall seeing warnings on the products he used, but if he had seen a warning on the bags of asbestos, he "[m]ore than certainly" would have taken precautions to protect himself. Aubin further testified that he did not expect that the normal use of the joint compounds and texture sprays would release dangerous dust into the air.

Aubin presented expert testimony to demonstrate that exposure to respirable asbestos, such as the SG-210 Calidria manufactured by Union Carbide, causes peritoneal mesothelioma. Aubin also presented expert testimony that his exposure to Union Carbide's asbestos through the ordinary use of the joint compounds and texture sprays was a substantial contributing cause of his peritoneal mesothelioma. In contrast, Union Carbide presented expert testimony that chrysotile asbestos, such as the type manufactured by Union Carbide, is no more likely to cause mesothelioma in its designed state than in its pure state.

At the close of evidence, Union Carbide moved for a directed verdict, which the trial court denied. As to the issue of warnings, Aubin proposed a special jury instruction regarding the failure to warn, to which Union Carbide objected as being incomplete because it did not include special instructions as to the learned intermediary defense. Union Carbide also proposed its own special jury instructions on the failure to warn claim.

The trial court gave a special jury instruction in accordance with Aubin's request and rejected Union Carbide's proposed instructions regarding the warnings. The instruction given, as proposed by Aubin, stated: "An asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end users of an unreasonable danger in the contemplated use of its products."

The relevant instructions included both the Standard Jury Instructions and several special instructions:

> The issues for your determination on the strict liability claims of the Plaintiff against Union Carbide Corporation are whether Plaintiff was exposed to asbestos while working with or around products manufactured by Union Carbide Corporation; if so, whether such products were defective when they left the possession of Union Carbide Corporation; and, if so, whether such defendants were a legal cause of the injuries or damages sustained by the Plaintiff.
> A product is defective:
> 1. If it is in a condition unreasonably dangerous to the user and the product is expected to and does reach the use without substantial change affecting that condition; or
> 2. If by reason of its design the product is in a condition unreasonably dangerous to the user and the

product is expected to and does reach the user without substantial change affecting that condition.

3. <u>A product is also considered defective when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings and their omission renders the product not reasonably safe</u>.

A product is unreasonably dangerous because of its design if the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the seller, or the risk of danger in the design outweighs the benefits.

<u>In the context of strict liability failure to warn, an otherwise safe product may be defective solely by virtue of inadequate warning.</u>

<u>The issue for your determination on the Plaintiff's negligence claim against Union Carbide is whether Union Carbide was negligent in failing to warn of the health hazards, if any, associated with exposure to its asbestos which Union Carbide knew, or should have known, by the use of reasonable care existed and, if so, whether such negligence was a legal cause of loss, injury or damage sustained by Plaintiff.</u>

. . . .

<u>An asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end users of an unreasonable danger in the contemplated use of its products.</u>

<u>All manufacturers are considered to hold the knowledge and skill of an expert. They are obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.</u>

<u>To warn adequately, the product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger.</u>

(Emphasis added as to non-standard instructions.)

Regarding the proposed verdict, Union Carbide objected to the form of the verdict because it failed to provide for special interrogatories separately as to both negligent design and negligent warning, as well as strict liability failure to warn

and strict liability design defect.  The trial court overruled Union Carbide's objections.

The verdict, with the jury's answers, stated as follows:

WE, THE JURY, return the following verdict:

1.  Was there negligence on the part of UNION CARBIDE which was the legal cause of damage to Plaintiff WILLIAM AUBIN?

YES __X__  NO ____

2.  Did UNION CARBIDE place products on the market with a defect which was the legal cause of damage to Plaintiff WILLIAM AUBIN?

YES __X__  NO ____

3.  Was there negligence on the part of Plaintiff which was a legal cause of his loss, injury, or damage?

YES ____  NO __X__

The jury returned a $14,191,000 verdict for Aubin, finding that Union Carbide's negligence was the legal cause of Aubin's damages and that Union Carbide placed products on the market with a defect that was the legal cause of Aubin's damages.  However, the jury also found that some of the intermediaries were liable, attributing only 46.25% of the fault to Union Carbide and apportioning the remaining 53.75% to several intermediaries whose "negligence or defect" it found to be a contributing cause of Aubin's damages.  Specifically, the jury attributed 8.75% of the fault to Georgia Pacific, LLC; 7.5% of the fault to Kaiser Gypsum Company; 12.5% of the fault to Premix Marbletite Manufacturing Company; and 25% of the fault to U.S. Gypsum Company, while also finding

several other intermediaries not at fault.[4]  After the trial court reduced the judgment to reflect Union Carbide's percentage of fault and settlements with other tortfeasors, the trial court entered a total judgment for Aubin and against Union Carbide in the amount of $6,624,150.

Union Carbide appealed, and the Third District reversed, holding that the trial court erred by denying Union Carbide's motion for directed verdict as to the design defect claim and that Union Carbide was entitled to a new trial on Aubin's failure to warn claim.  Aubin, 97 So. 3d at 889.  In reaching this result, the Third District made three legal conclusions.

First, the Third District held that the trial court committed reversible error by applying the Second Restatement, rather than the Third Restatement, to strict products liability design defect claims:

> We note that Union Carbide is correct in pointing out that Aubin failed to present any evidence regarding a "reasonable alternative design."  As is demonstrated from the transcript of the charge conference, Aubin's counsel did not believe such evidence was necessary because he litigated the design defect claim as if it was governed by the Second Restatement's "consumer expectations" standard:
>
>> It's defective by design if it does not act as a reasonable consumer would expect it to act.  And that's what the jury has to decide.
>>
>> . . . .

---

4.  There were seven intermediaries listed on the verdict form.

- 15 -

> Mr. Terry is under the impression that . . . I've got to come in here with alternative designs of how they should have done it instead, and that's not required.
>
> <u>As has already been established, however, the Third Restatement rejects the consumer expectations test as an independent basis for finding a product defectively designed.</u>  Restatement (Third) of Torts:  Products Liability § 2 cmt. g. ("Under Subsection (b), consumer expectations do not constitute an independent standard for judging the defectiveness of product designs."); <u>Agrofollajes</u>, 48 So. 3d at 996-97 (rejecting the consumer expectations test as an independent basis for finding a design defect in light of this Court's adoption of the Third Restatement in <u>Kohler</u>).  Nevertheless, as is demonstrated below, Aubin's failure to offer evidence regarding a reasonable alternative design did not necessarily preclude a finding of liability for a defective design.
>
> While the plain language of subsection 2(b) requires plaintiffs with design defect claims to prove the availability of a "reasonable alternative design," satisfying subsection 2(b) is not the exclusive means by which plaintiffs may establish liability for a defective design under the Third Restatement.  Under comment e., plaintiffs may forego the demonstration of a "reasonable alternative design" by showing that the product design at issue is "manifestly unreasonable." Restatement (Third) of Torts:  Products Liability § 2 cmt. e.  A product design is "manifestly unreasonable" when "the extremely high degree of danger posed by its use . . . so substantially outweighs its negligible social utility that no rational, reasonable person, fully aware of the relevant facts, would choose to use . . . the product."  <u>Id.</u>

<u>Aubin</u>, 97 So. 3d at 896-97 (emphasis added).

Second, the Third District held that although there was sufficient evidence for the jury to conclude that SG-210 Calidria was a "designed" product and that the design was "defective," Union Carbide was entitled to a directed verdict on the design defect claim because Aubin failed to present evidence that the defective design of the product caused Aubin's harm.  <u>Id.</u> at 897-98.  In other words, the

- 16 -

Third District concluded that the asbestos in SG-210 Calidria was no more

dangerous in its designed and manufactured state than asbestos was as a raw

material:

> Under Section 5, the last hurdle is proving that the design defect caused the plaintiff's harm.  See Restatement (Third) of Torts:  Products Liability § 5(a) (predicating liability on a showing that "the component is defective in itself, as defined in this Chapter, and the defect causes the harm.") . . . .  This requirement reflects the understanding that "[p]roducts are not generically defective merely because they are dangerous."  Restatement (Third) of Torts:  Products Liability § 2 cmt. a.
> 
> In this case, Aubin failed to present any evidence suggesting that the defective design of SG-210 Calidria caused Aubin's harm.  While there is record evidence suggesting that the design of SG-210 Calidria caused it to be more dangerous with respect to the contraction of asbestosis than raw chrysotile asbestos, such evidence is irrelevant to Aubin's design defect claim because Aubin did not contract asbestosis; he contracted mesothelioma.  <u>And as was established above, Aubin failed to present any evidence suggesting that the purported design defect of SG-210 Calidria made it more dangerous than raw chrysotile asbestos with respect to the contraction of mesothelioma</u>.  It is clear, therefore, that Aubin pointed to nothing other than the dangerous propensities of basic, raw chrysotile asbestos as the source of his harm.  As we have already explained, such evidence is legally insufficient under the Third Restatement because "products are not generically defective merely because they are dangerous."  <u>Id.</u>  Accordingly, a plaintiff must demonstrate that the product's defective design, rather than its basic, raw, and naturally occurring characteristics, caused the plaintiff's harm.  <u>See</u> Restatement (Third) of Torts:  Products Liability § 5.  Because Aubin introduced no evidence demonstrating that the design of SG-210 Calidria caused it to be more dangerous than it naturally is with respect to the harm suffered by Aubin, the trial court erred in denying Union Carbide's motion for a directed verdict pertaining to Aubin's design defect claim.

<u>Id.</u> (emphasis added).

Finally, the Third District held that the trial court reversibly erred on the warning claim by providing incomplete jury instructions, which informed the jury that Union Carbide had a duty to warn the ultimate users of an unreasonable danger in the contemplated use of its product but failed to instruct the jury that this duty could be discharged by reasonable reliance on an intermediary. In disagreeing with the trial court's reliance on the Fourth District's opinion in McConnell, the Third District explained:

> To the extent the trial court may have relied on the Fourth District's decision in McConnell, its reliance was misplaced because the McConnell court's reading of the Kavanaugh court's holding was flawed. For example, the McConnell court concluded that the Kavanaugh court held "that the 'learned intermediary' exception is not applicable to Calidria Asbestos and Ready-Mix with its hidden measure of asbestos." McConnell, 937 So. 2d at 156. The Kavanaugh court, however, made no such finding. The Kavanaugh court concluded that it was for the jury to weigh whether the warnings provided to the manufacturer who integrated Union Carbide's product were adequate and whether Union Carbide discharged its duty to end users. It also appears that the McConnell court may have transformed the affirmation of the jury's determination in Kavanaugh into a legal holding to be applied in all future cases involving Calidria asbestos. Because such a holding would effectively preclude Union Carbide from litigating against future plaintiffs as to whether its reliance on intermediaries was reasonable, it comes perilously close to application of non-mutual, offensive collateral estoppel, which is impermissible in Florida. E.C. v. Katz, 731 So. 2d 1268, 1269 (Fla. 1999) (quoting Stogniew v. McQueen, 656 So. 2d 917, 919 (Fla. 1995)). In any event, the McConnell court neither receded from nor overruled Kavanaugh. As such, Kavanaugh, which is consistent with our analysis in this case, is still good law.

Id. at 904 n.6. Accordingly, the Third District affirmed in part and reversed in part, remanding the action for a new trial. Id. at 904.

## ANALYSIS

Aubin raises three issues before this Court: (1) whether the Third District ignored this Court's precedent in West by applying the Third Restatement; (2) whether the Third District erred in holding that Aubin failed to present sufficient evidence that the defective design of SG-210 Calidria caused his mesothelioma; and (3) whether the Third District erred in determining that Union Carbide was entitled to a jury instruction on the learned intermediary defense. We address each issue in turn.

### I. Whether the Third District Erred in Failing to Apply Our Precedent in West

We first consider the Third District's decision to apply the Third Restatement, which expressly and directly conflicts with our holding in West, 336 So. 2d 80, and with the Fourth District's decision in McConnell, 937 So. 2d 148, both of which applied the consumer expectations test set forth in the Second Restatement as the test for design defect under strict products liability. In analyzing this claim, we must review the cases applying the consumer expectations test and then contrast that approach with the Third District's adoption of the Third Restatement. We then analyze other state supreme court opinions that have considered this same question and expressed concern that the Third Restatement's

- 19 -

approach in strict products liability cases creates numerous public policy concerns

that are inconsistent with the purpose behind adopting strict liability. In doing so,

we emphasize that the Restatement is not a uniform code that is promulgated to

harmonize the law throughout the states. For the reasons set forth below, we

conclude that the Second Restatement, which applies the consumer expectations

test as the appropriate test for determining a design defect, is more closely aligned

with the policy reasons behind Florida's adoption of strict liability in products

design cases.

## A. Florida's Prior Adoption of Strict Liability in Design Defect Cases

In West, this Court addressed the issue of whether a manufacturer may be

held liable under the theory of strict liability in tort for injury to a user of the

defective product and, joining the majority of jurisdictions that had considered the

issue, adopted strict products liability:

> In other words strict liability should be imposed only when a
> product the manufacturer places on the market, knowing that it is to
> be used without inspection for defects, proves to have a defect that
> causes injury to a human being. The user should be protected from
> unreasonably dangerous products or from a product fraught with
> unexpected dangers. In order to hold a manufacturer liable on the
> theory of strict liability in tort, the user must establish the
> manufacturer's relationship to the product in question, the defect and
> unreasonably dangerous condition of the product, and the existence of
> the proximate causal connection between such condition and the
> user's injuries or damages.

West, 336 So. 2d at 86-87.  In enunciating the policy reasons for the importance of strict liability, a unanimous Court explained:

> The cost of injuries or damages, either to persons or property, resulting from defective products, should be borne by the makers of the products who put them into the channels of trade, rather than by the injured or damaged persons who are ordinarily powerless to protect themselves.  We therefore hold that a manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

Id. at 92.  We noted that prior Florida courts had imposed strict liability in tort in such situations and that this approach was also in conformity with the principles set forth in the Second Restatement.  Id. at 86.

The Second Restatement applies the "consumer expectations" test, which considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.  See Restatement (Second) of Torts § 402A (1965).  This test intrinsically recognizes that a manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product.

Since our adoption of the consumer expectations test, we have rejected applying legal principles that are inconsistent with the general philosophy espoused by this Court in West.  See, e.g., Auburn Mach. Works Co. v. Jones, 366 So. 2d 1167, 1167 (Fla. 1979) (rejecting the patent danger doctrine, which

insulates manufacturers from liability if a dangerous product does not create a unknown risk to the user and is without any latent defect, as a total defense to strict liability claims involving defective products); Ford Motor Co. v. Hill, 404 So. 2d 1049, 1050-52 (Fla. 1981) (rejecting the argument that only a negligence standard should apply to design defect claims).

The principles this Court set forth in West have been subsequently applied for almost four decades to cases involving a variety of products and contexts. See, e.g., Samuel Friedland Family Enter. v. Amoroso, 630 So. 2d 1067, 1071 (Fla. 1994) (applying West to commercial lessors who were in the business of leasing a sailboat, which was an allegedly defective product); Stazenski v. Tennant Co., 617 So. 2d 344, 346 (Fla. 1st DCA 1993) (applying West to a manufacturing defect claim regarding an industrial sweeper); Visnoski v. J.C. Penney Co., 477 So. 2d 29, 29 (Fla. 2d DCA 1985) (applying West to strict liability claims against retailers); Liggett Group, Inc. v. Davis, 973 So. 2d 467, 473-75 (Fla. 4th DCA 2007) (applying the Second Restatement and West in a claim involving cigarette smoking injuries); Cintron v. Osmose Wood Preserving, Inc., 681 So. 2d 859, 861 (Fla. 5th DCA 1996) (applying West in a strict liability claim regarding flame retardant plywood).

In fact, two prior cases from the Fourth District, Kavanaugh and McConnell, involved this exact product—SG-210 Calidria—and the same defendant. See

Kavanaugh, 879 So. 2d at 45; McConnell, 937 So. 2d at 154. In Kavanaugh, the Fourth District affirmed a jury verdict of $1,153,000 against Union Carbide, where the jury found Union Carbide 100% liable for Kavanaugh's damages related to asbestos exposure during "his employ as a carpenter when he sanded joint compound which contained asbestos." Kavanaugh, 879 So. 2d at 43. The evidence established that Kavanaugh "primarily used 'Ready Mix' joint compound manufactured by Georgia-Pacific" and that Union Carbide "manufactured the asbestos and supplied Georgia-Pacific with the asbestos that eventually ended up in the 'Ready Mix' joint compound." Id. at 43.

On appeal, Union Carbide claimed that it was entitled to a directed verdict on the failure to warn claim because "it satisfied its duty to warn by informing Georgia-Pacific of the hazards of asbestos" and that "as a bulk supplier, it had no affirmative duty to warn ultimate users of asbestos." Id. at 44. In rejecting Union Carbide's claim that, as a matter of law, it could not be responsible for warning ultimate users, the Fourth District relied on factors set forth in section 388 of the Second Restatement, concluding that Union Carbide did not fulfill its duty to warn. In affirming the jury verdict, the Fourth District noted that Union Carbide "provided Georgia-Pacific with limited information which was not communicated to the ultimate users. Because [Union Carbide] did not take reasonable precautions

under the circumstances, its duty to warn did not stop with Georgia-Pacific, but continued to the ultimate user." Id. at 46.

In McConnell, 937 So. 2d at 149, the Fourth District faced a similar factual scenario, in which the plaintiff worked for various drywall businesses and often used "Ready Mix," a joint compound that contained Calidria asbestos. The plaintiff asserted that he was never warned that the joint compound contained asbestos and, as a consequence of using the product as intended, he inhaled asbestos fibers manufactured by Union Carbide, which caused him to develop asbestosis. Id. at 149-50.

Union Carbide argued that the jury should not be instructed on the design or manufacturing defect as a basis for strict liability because it sold only "raw" asbestos, which was incapable of being defectively manufactured or designed. Id. at 150. The trial court agreed that Union Carbide could not be strictly liable for a product defect because the product was "raw" asbestos. Id.

On appeal, the Fourth District rejected that argument, relying on Union Carbide's own marketing literature, which promoted its proprietary manufacturing process that caused Calidria asbestos to go "twice as far" as that of their competitors. Id. The Fourth District concluded that the plaintiffs were entitled to have the jury instructed as to the consumer expectations test for strict liability, which originated in section 402A of the Second Restatement. Id. at 155. In

making this determination, the Fourth District relied on <u>Force v. Ford Motor Co.</u>, 879 So. 2d 103, 106 (Fla. 5th DCA 2004), which held that "[u]nder the consumer-expectation theory a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner." <u>McConnell</u>, 937 So. 2d at 151 (quoting <u>Force</u>, 879 So. 2d at 106).

## B.  The Third District's Adoption of the Third Restatement

In contrast to <u>McConnell</u> and <u>Kavanaugh</u>, both of which applied the Second Restatement to similar scenarios, in <u>Aubin</u>, the Third District explicitly rejected the application of the consumer expectations test in section 402A of the Second Restatement.  Instead, the Third District held that the proper test for design defect was articulated in the Third Restatement, concluding that the risk utility test and the component parts doctrine, as explained in sections 2 and 5 of the Third Restatement, Products Liability, were applicable to the claims at issue.  <u>Aubin</u>, 97 So. 3d at 894.  The Third District recognized that this Court had adopted the consumer expectations test set forth in section 402A of the Second Restatement in <u>West</u> and that the Fourth District in <u>McConnell</u> applied the consumer expectations test in a case involving the same product.  <u>Id.</u> at 893-94.  The Third District, however, adhered to its own precedent, noting that it had already adopted sections

2 and 5 of the Third Restatement, Products Liability, in <u>Kohler</u>, 907 So. 2d at 598-99, and <u>Agrofollajes</u>, 48 So. 3d at 997.  <u>See</u> <u>Aubin</u>, 97 So. 3d at 893.

Thus, in approving the use of the Third Restatement, the Third District utilized the risk utility test as the legal standard for a design defect claim, in which the plaintiff must demonstrate that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe."  <u>Kohler</u>, 907 So. 2d at 599.  Specifically, the pertinent portion of the Third Restatement reads as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings.  A product:
>
> . . .
>
> (b)  is <u>defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe</u>;
>
> (c)  is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the

> instructions or warnings renders the product not
> reasonably safe.

Restatement (Third) of Torts: Products Liability § 2 (1998) (emphasis added).

The critical difference regarding design defects between the Second Restatement and the Third Restatement is that the Third Restatement not only replaces the consumer expectations test with the risk utility test but also requires the plaintiff to demonstrate the existence of "a reasonable alternative design." Id. The intent of the Third Restatement to introduce foreseeability of the risk as a part of a plaintiff's proof of an action for design defects is evident. As Comment (a) to Section 2 of the Third Restatement explains, the Third Restatement incorporates an element of foreseeability of risk of harm and a risk-benefit test. Id. By introducing foreseeability of the risk to the manufacturer as part of the calculus for design defect and requiring proof of a "reasonable alternative design," the Third Restatement reintroduces principles of negligence into strict liability.

### C. Whether to Adopt the Third Restatement in Strict Products Liability Design Defect Cases

In determining whether to adhere to our precedent and continue to apply the Second Restatement or to adopt the Third Restatement in strict liability design defect cases, we are assisted by the reasoning of several state supreme courts, which were confronted with similar decisions and declined to adopt the Third Restatement because of its markedly different approach to strict products liability.

See, e.g., Potter v. Chicago Pneumatic Tool Co., 694 A.2d 1319, 1332 (Conn. 1997); Delaney v. Deere & Co., 999 P.2d 930, 946 (Kan. 2000); Rodriguez v. Suzuki Motor Corp., 996 S.W.2d 47, 64-65 (Mo. 1999); Tincher v. Omega Flex, Inc., 104 A.3d 328, 335 (Pa. 2014); Green v. Smith & Nephew AHP, Inc., 629 N.W.2d 727, 751-752 (Wis. 2001). These decisions have enunciated several compelling reasons for rejecting the adoption of the Third Restatement as to design defect.

First, by departing from the consumer expectations test, set forth in the Second Restatement, and instead focusing on the foreseeability of the risk of harm, including a cost-benefit analysis, the Third Restatement "blurs the distinction between strict products liability claims and negligence claims." Green, 629 N.W. 2d at 751. Rather than focusing on the design of the product, it focuses on the conduct of the manufacturer.

Besides shifting the emphasis away from strict liability principles, the Third Restatement's risk utility test imposes a higher burden on consumers to prove a design defect than exists in negligence cases—the antithesis of adopting strict products liability in the first place. As explained by the Supreme Court of Wisconsin:

> But we are more troubled by the fact that 2(b) sets the bar higher for recovery in strict products liability design defect cases than in comparable negligence cases. Section 2(b) does not merely incorporate a negligence standard into strict products liability law.

Instead, it adds to this standard the additional requirement that an injured consumer seeking to recover under strict products liability must prove that there was a "reasonable alternative design" available to the product's manufacturer. Thus, rather than serving the policies underlying strict products liability law by allowing consumers to recover for injuries caused by a defective and unreasonably dangerous product without proving negligence on the part of the product's manufacturer, 2(b) increases the burden for injured consumers not only by requiring proof of the manufacturer's negligence, but also by adding an additional—and considerable—element of proof to the negligence standard. This court will not impose such a burden on injured persons. Accord Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 360 N.W.2d 2 (Wis. 1984) (rejecting the argument that Wisconsin strict products liability requires proof of an alternative, safer design).

Green, 629 N.W.2d at 751-52 (footnote omitted).

The Third Restatement, in some instances, could insulate a manufacturer from all liability for unreasonably dangerous products solely because a reasonable alternative design for that type of product may be unavailable. The Supreme Court of Pennsylvania, in a scholarly and thoughtful analysis, explained its reasons behind rejecting the Third Restatement's approach:

For the reasons that follow, we conclude that "adoption" of the Third Restatement approach is problematic. For one thing, articulating the burden of proof in terms of evidence (alternative design) deemed probative of the general principle of strict liability proscriptively limits the applicability of the cause of action to certain products as to which that sort of evidence is available. The approach suggests a priori categorical exemptions for some products—such as novel products with no alternative design—but not others.

Tincher, 104 A.3d at 395.

While the original purpose of imposing strict liability for defective and unreasonably dangerous products was to relieve injured consumers from the difficulties of proving negligence on the part of the product's manufacturer, the Third Restatement eliminates consideration of consumer expectations, the linchpin of the Second Restatement. The consumer expectations test intrinsically recognizes a manufacturer's central role in crafting the image of a product and establishing the consumers' expectations for that product—a portrayal which in turn motivates consumers to purchase that particular product. As expressed by the Supreme Court of Kansas in rejecting the Third Restatement's focus on only the risk utility test and explaining the benefit of the consumer expectations test:

> We are convinced that in products liability cases, consumer expectations play a dominant role in the determination of defectiveness. Addressing this concern, Professor Marshall Shapo observed in his comments upon the Third Restatement's failure to recognize the efficacy of consumer expectations, Shapo, Defective Restatement Design, 8 Kan. J.L. & Pub. Pol'y 59, 60 (1998):
>
> > "A broad concern about the [Third] Restatement as published stems from its single-minded emphasis on a risk/utility test. This seems to me, by itself, is an impoverished concept. It is impoverished especially insofar as the reporters ruled out consumer expectations as an independent test. They thereby ignored the centrality of what we all know as people and what I would hope that you would recognize as judges: the centrality of product portrayals and images and their role in creating consumer motives to purchase or encounter products."

Delaney, 999 P.2d at 945 (emphasis added). Clearly, the Third Restatement fails to consider the crucial link between a manufacturer establishing the reasonable expectations of a product that in turn cause consumers to demand that product.

Further, the Third Restatement places upon the plaintiff an additional burdensome element of proof, requiring the injured consumer to step into the shoes of a manufacturer and prove that a reasonable alternative design was available to the manufacturer. Even while recognizing exceptions to requiring proof of a reasonable alternative design, under the Third Restatement, the burden is still placed on the plaintiff to demonstrate his or her exemption from this additional requirement.[5]

The Supreme Court of Connecticut has expressed similar concerns: "in some instances, a product may be in a defective condition unreasonably dangerous to the user even though no feasible alternative design is available." Potter, 694 A.2d at 1332. As explained in Potter, the "feasible alternative design requirement imposes an undue burden on plaintiffs that might preclude otherwise valid claims from jury consideration." Id.

------

5. The Third Restatement identifies some exceptions to the requirement of proving a reasonable alternative design, including the "manifestly unreasonable design cases" under section 2(b), comment e, and where a product's design fails to comply with the applicable product safety statute or regulation and renders the product defective.

In fact, many states have expressed concerns about the Third Restatement itself, as it pertains to strict products liability.[6]  The Supreme Court of Kansas has explained why the requirement of a reasonable alternative design in the Third Restatement has been harshly criticized and has not become the rule in the majority of jurisdictions:

> The Third Restatement's requirement that a plaintiff produce a reasonable alternative design has been harshly criticized.  See Vargo, The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave, 26 U. Mem. L. Rev. 493 (1996); Vandall, State Judges Should Reject the Reasonable Alternative Design Standard of the Restatement (Third), Products Liability, Section 2(b), 8 Kan. J.L. & Pub. Pol'y 62 (1998); Westerbeke, The Reasonable Alternative Design Requirement, 8 Kan. J.L. & Pub. Pol'y 66 (1998).  Vandall states that the reasonable alternative design requirement is not supported by public policy or economic analysis because the cost of processing a case will make it economically impossible to produce a reasonable alternative design in a small products liability case.  8 Kan. J.L. & Pub. Pol'y at 63.  Further, contrary to the view of the authors of the Third Restatement that the majority of states require a reasonable alternative design to establish a design defect, research by John F. Vargo indicates that very few states in fact have this requirement.  See 26 U. Mem. L. Rev. at 550–553.  Vargo, in his exhaustive review, examines the Restatement (Third) of Torts' claim that "reasonable alternative design" is the majority rule in this country and concludes that, far

---

6.  Not all states have concerns about the reasonable alternative design requirement, however.  At least three states have adopted an absolute requirement of alternative design evidence under the common law: Alabama, Maine, and Michigan.  See John F. Vargo, The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave, 26 U. Mem. L. Rev. 493, 536-37 (1996).

from a majority rule, only three states require reasonable alternative design and five do so by statute. See Appendix IV and related textual support for author's conclusions, 26 U. Mem. L. Rev. at 951, 501-951.

Our own research also reflects that a majority of jurisdictions in this country do not require a reasonable alternative design in product liability actions. It is clear in Kansas that evidence of a reasonable alternative design may be presented but is not required. We adhere to this principle and believe that it represents the majority rule in this country. Moreover, we believe the focus in such actions must remain on the product which is the subject of the litigation. In Garst v. General Motors Corp., 484 P.2d 47 (Kan. 1971), a case decided before our adoption of the Restatement (Second) of Torts § 402A, we noted that with regard to negligent design, it was "insufficient merely to assert that a different design would have alleviated or averted the plaintiff's injuries."

In rejecting Comment I, we agree that as the foreword to the Third Restatement makes clear, the new Restatement "goes beyond the law." Hazard, Foreword to Restatement (Third) of Torts, xv, xvi (1997). Rather than simply taking a photograph of the law of the field, the Third Restatement goes beyond this to create a framework for products liability. We have examined Comment I and find it wanting. The adoption of Comment I necessarily involves the adoption of the reasonable alternative design standard and an exclusive risk/utility analysis of that reasonable alternative design to determine whether the subject product is defective.

Delaney, 999 P.2d at 945-46; accord Potter, 694 A.2d at 1331 (requirement of a

reasonable alternative design as part of the plaintiff's proof is not the view of a

majority of jurisdictions).

The Restatement is not a codification of law or necessarily the consensus on

the best policy for courts regarding the proper legal standard for strict liability in

products liability cases.[7]  In fact, the methodology employed by the American Law

Institute in drafting the Third Restatement reflects hurdles in creating a categorical

pronouncement in an area of law as complex and fact-driven as strict products

liability.  As explained by the Supreme Court of Pennsylvania in Tincher:

> The methodology employed by the reporters suggests additional
> potential weaknesses in the strict liability schemata of the Third
> Restatement that should caution courts against categorical
> pronouncements.  Citing representative cases from several
> jurisdictions, the reporters offer that an alternative-design driven risk-
> utility general rule—with a special consumer expectations rule for
> cases in which the design defect is demonstrable—reflects the
> consensus among American jurisdictions as to the applicable liability
> construct in "classic design cases."  See [James A. Henderson, Jr. &
> Aaron D. Twerski, Achieving Consensus on Defective Product
> Design, 83 Cornell L. Rev. 867, 887-901 (1998)].  Notably, while

---

7.  The American Law Institute (ALI), which publishes the Restatement, is a
private body that was organized in 1923 and is composed of judges, law
professors, and lawyers.  See Spencer H. Silverglate, The Restatement (Third) of
Torts Products Liability—the Tension Between Product Design and Product
Warnings, Fla. B.J., Dec. 2001, at 10, n.1.  According to its charter, the ALI's
purpose is "to promote the clarification and simplification of the law and its better
adaptation to social needs, to secure the better administration of justice, and to
encourage and carry on scholarly and scientific legal work."  Id.

> About every 30 years, the ALI prepares a new Restatement of the Law
> of Torts (among other topic areas).  Although the restatements do not
> have the force of law, they traditionally have been influential on the
> courts of the United States.  The reporters of the Third Restatement
> were Professor James Henderson, Jr., of Cornell Law School and
> Aaron Twerski of Brooklyn Law School, who were assisted in its
> preparation by a 20-person advisory committee composed of judges,
> law professors, and practicing members of the plaintiff and defense
> bars.

Id.

recognizing that "tort cases are particularly fact-sensitive," the reporters purported to undertake an "empirical study of case law" to determine whether the alternative-design driven risk-utility general rule has support in the decisional law in a majority of jurisdictions. The reporters commented that: "[t]ort cases are particularly fact-sensitive and courts are consequently prone to pepper their decisions with dicta and footnotes to allow 'wiggle room' for cases that may arise in the future. In contrast to legal treatise writers and restaters who, in synthesizing the law, tend to speak precisely and categorically, courts in their published opinions are more likely to be open-textured and indecisive." Id. at 888. This approach no doubt fulfills the role of the American Law Institute in its own salutary task of restating and clarifying a view of strict liability that can be reduced to decisive terms. We also respect the effort of the Third Restatement reporters in approaching that non judicial task practically and with humility. But, what drives the Institute and treatise writers does not make comparative modesty, nuance, and reticence in the judiciary mistaken (much less indecisive) in a jurisdiction, like Pennsylvania, where the area, to date, has been the exclusive province of the common law.

Tincher, 104 A.3d at 396-97.

While the Third Restatement was intended to restate the law as decided by state courts and state legislatures, various courts have criticized its discussion of strict products liability, emphasizing that it "goes beyond the law" because "[r]ather than simply taking a photograph of the law of the field," the Third Restatement attempts to create a framework for strict products liability by urging the adoption of the reasonable alternative design standard and an exclusive risk/utility analysis, notwithstanding that the majority of jurisdictions in this country do not require a reasonable alternative design in strict products liability actions. Delaney, 999 P.2d at 945-46; see also Potter, 694 A.2d at 1331 ("[O]ur

independent review of the prevailing common law reveals that the majority of jurisdictions <u>do not</u> impose upon plaintiffs an absolute requirement to prove a feasible alternative design.").

For example, Florida is counted by the reporters as having adopted the "risk/benefit" test for design defect cases and implicitly requiring proof of a reasonable alternative design. <u>See</u> Restatement (Third) of Torts: Prods. Liab §2(b), Reporters' Note, cmt. d (1998). In support, the reporters rely on <u>Radiation Technology, Inc. v. Ware Construction Co</u>., 445 So. 2d 329 (Fla. 1983), as the "leading case" in Florida for these legal principles. But this reliance is misplaced because <u>Radiation Technology</u> was not a strict liability case—the legal issue before the Court involved a jury instruction in a negligence action. <u>Radiation Tech.</u>, 445 So. 2d at 331. In fact, in that decision, this Court explicitly noted the adoption of strict liability in <u>West</u> and then referred to the definition of strict liability under the Second Restatement. <u>Id.</u>

In considering which approach is in line with our prior strict liability jurisprudence, we are in accord with those state supreme courts that have thoughtfully considered this issue and determined that the Third Restatement's new approach is inconsistent with the rationale behind the adoption of strict products liability. The Third Restatement is, in fact, contrary to this state's prior precedent. Decades ago, this Court recognized that the reason behind adopting

strict products liability was based in part on the policy that "[t]he manufacturer, by placing on the market a potentially dangerous product for use and consumption and by inducement and promotion encouraging the use of these products, thereby undertakes a certain and special responsibility toward the consuming public who may be injured by it." West, 336 So. 2d at 86. Thus, in approaching design defect claims, we adhere to the consumer expectations test, as set forth in the Second Restatement, and reject the categorical adoption of the Third Restatement and its reasonable alternative design requirement.

The important aspect of strict products liability that led to our adoption in West remains true today: the burden of compensating victims of unreasonably dangerous products is placed on the manufacturers, who are most able to protect against the risk of harm, and not on the consumer injured by the product. Increasing the burden for injured consumers to prove their strict liability claims for unreasonably dangerous products that were placed into the stream of commerce is contrary to the policy reasons behind the adoption of strict liability in West.

Adopting the definition of design defect advanced by the Third Restatement would frustrate these policy concerns. As the Supreme Court of Wisconsin recognized:

> Where a manufacturer places a defective and unreasonably dangerous product into the stream of commerce, the manufacturer, not the injured consumer, should bear the costs of the risks posed by the

product. Because 2(b) unduly obstructs this equitable principle, we refuse to adopt 2(b) into Wisconsin law.

Green, 629 N.W.2d at 752.

Further, a manufacturer plays a pivotal role in crafting the image of a product and establishing the consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product. The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates. The Third Restatement's risk utility test shifts away from this focus and, in fact, imposes a higher burden on consumers to prove a design defect than exists in negligence cases—the exact opposite of the purposes of adopting strict products liability in the first place.

The consumer expectations test does not inherently favor either party. In fact, manufacturers have at times sought application of the consumer expectations test over the risk utility test, such as in cases involving tobacco products or where a danger was open and obvious. See Larry S. Stewart, Strict Liability for Defective Product Design: The Quest for A Well-Ordered Regime, 74 Brook. L. Rev. 1039, 1059 n.33 (2009).

While we conclude that the Third Restatement's risk utility test and establishment of a reasonable alternative design mandate are not requirements for finding strict liability, we note that nothing precludes the plaintiff in proving his or her case from showing that alternative safer designs exist—or for that matter

precludes the defendant from showing that it could not have made the product any safer through reasonable alternative designs. The Third Restatement, while rejecting the consumer expectations test as an independent basis for defining strict liability design defect, also provides that a "broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe under this provision, including, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing." Am. L. Prod. Liab. 3d § 28:3. In this regard, we conclude—as did the Supreme Courts of Kansas, Pennsylvania, and Wisconsin—that the plaintiff is not required, but is permitted, to demonstrate the feasibility of an alternative safer design and that the defendant may present evidence that no reasonable alternative design existed, while also arguing in defense that the benefit of the product's design outweighed any risks of injury or death caused by the design. See Delaney, 999 P.2d at 944; Tincher, 104 A.3d at 397; Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 768 N.W.2d 674, 686 (Wis. 2009).

As the Supreme Court of Pennsylvania explained, allowing evidence of a reasonable alternative design is different than mandating evidence of a reasonable alternative design as part of the plaintiff's burden of proof:

> That evidence of the existence and specifications of an alternative design is relevant and even highly probative to prove disputed issues in a products liability case, such as technological feasibility, cost, etc., is certainly true. That the more typical case implicates the type of products and circumstances in which evidence of an alternative product design is the most persuasive and efficient means of convincing the trier of fact may also be true. That offering evidence of an alternative product design may be the preferred legal strategy of the plaintiff's bar in certain cases—or may be a strategy the defense bar would like to impose on the plaintiff's bar in certain cases—again may also be true. But, while the reporters' intuition that meritorious cases are premised upon certain types of evidence may have some general validity and support in practice (and may prove helpful to litigants in articulating claims and preparing defenses), the reporters' commentary candidly betrays a problem—for the judiciary at least—of perspective. Principally, at least in a climate where suggestions are made along the lines of simply "adopting" or "moving to" a Restatement construct, it is our view that the reporters' "precise and categorical" perspective insufficiently accounts for the imperatives of the courts' more modest decisional role, by, for example, describing the reasoned and purposeful articulation of general principles as "dicta."

Tincher, 104 A.3d at 397.

In fact, the jury instructions approved by this Court use both the consumer expectations test and risk utility test as alternative definitions of design defect. See In re Std. Jury Instr. in Civ. Cases—Report No. 13-01, 160 So. 3d 869, 871 (Fla. 2015). These alternative definitions have been in effect for over two decades after the Court directed the Committee on Standard Jury Instructions to improve its

products liability instructions.  See Ford Motor Co., 404 So. 2d at 1052 n.4.

Significantly, however, there is absolutely no requirement embodied in the

Standard Jury Instructions, nor has this Court ever adopted a requirement as set

forth in the Third Restatement, that the plaintiff must either present proof of a

reasonable alternative design or establish that the product was manifestly

unreasonable before the requirement of proof of an alternative design could be

excused.  We do not direct, at this point, whether the standard jury instructions

should be modified in light of this opinion.  The parties may, in proving or

defending against such claims, present evidence that a reasonable alternative

design existed and argue whether the benefit of the product's design outweighed

any risks of injury or death caused by the design.

Consistent with our decision in West, we approve the portion of McConnell

that applied the Second Restatement, including its holding that correctly focused

on the consumer expectations test.  We decline to recede from our precedent in

West and thus disapprove of the Third District's decisions in Aubin, Kohler, and

Agrofollajes, which adopted and applied the Third Restatement.

## II.  Whether Union Carbide Was Entitled to a Directed Verdict on the Design Defect Claim

Next, Aubin asserts that the Third District erred when it held that Aubin

failed to present sufficient evidence that the defective design of SG-210 Calidria

caused Aubin's harm and thus Union Carbide was entitled to a directed verdict on

the design defect claim. While the Third District concluded that Aubin presented sufficient evidence to prove that SG-210 Calidria was a "designed" product and that the design of SG-210 Calidria was "defective," the Third District nevertheless concluded that Aubin did not establish causation under the Third Restatement in light of the fact that Aubin "failed to introduce any evidence suggesting SG-210 Calidria was more dangerous than raw chrysotile asbestos with respect to the contraction of cancer or peritoneal mesothelioma." Aubin, 97 So. 3d at 890.

We conclude that the Third District improperly merged the Third Restatement's definition of design defect with causation, conflating the elements of those two prongs. The causation prong, under both the Second Restatement and the Third Restatement, simply applies the general rules of causation, requiring the plaintiff to show that the defect caused the injury or harm alleged. See, e.g., Liggett Grp., 973 So. 2d at 475 (holding that under the Second Restatement, plaintiffs must demonstrate "[f]irst, that the product is defective; and, second, that such defect caused plaintiff's injuries"); Restatement (Third) of Torts: Prod. Liab. § 15 (1998) ("Whether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort."). Likewise, in the newly adopted standard jury instructions, legal causation in a products liability case is explained as "[A defect in a product] [Negligence] is a legal cause of [loss] [injury] [or] [damage] if it directly and in natural and

- 42 -

continuous sequence produces or contributes substantially to producing such [loss] [injury] [or] [damage], so that it can reasonably be said that, but for the [defect] [negligence], the [loss] [injury] [or] [damage] would not have occurred." In re Std. Jury Instr. in Civ. Cases—Report No. 13-01, 160 So. 3d at 877.

However, in analyzing causation, the Third District conflated this element with the Third Restatement's definition of a design defect, requiring a plaintiff to show that SG-210 Calidria asbestos was more dangerous than raw asbestos in causing mesothelioma. First, the use of the Third Restatement's definition of a design defect is contrary to the consumer expectations test, as set forth in the Second Restatement. Under the consumer expectations test, a product is considered to be defective "where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A cmt. g. (1965). Second, causation addresses only whether the defect caused the harm. The proper test of causation is not to compare the dangerousness of one product with another unreasonably dangerous product.

Our review of the record demonstrates that the trial court correctly refused to direct a verdict for Union Carbide on its design defect claim because Aubin did in fact present sufficient evidence on causation to allow this claim to be considered by the jury. In applying the correct standard for causation, Aubin was merely

- 43 -

required to show that the defective design of the SG-210 Calidria directly and in natural and continuous sequence produced or contributed substantially to producing Aubin's mesothelioma, so that it can reasonably be said that, but for the defect, the injury would not have occurred.

The evidence presented at trial demonstrated that, as to the design of the SG-210 Calidria, Union Carbide specifically mined the short fiber form of chrysotile asbestos and subjected this asbestos to a "proprietary manufacturing process" in order to yield "essentially a pure asbestos fiber content" that had a unique shape and physical structure. Union Carbide then created different grades based on the asbestos, including a resin grade for nonaqueous markets and a standard grade. SG-210 Calidria was distinctive in that it was subjected to the centrifuge process twice, which was significant to the manufacturing process, given that the more times chrysotile asbestos passed through this system, the more the fibers were pulled apart from each other, thereby increasing the efficiency of the product. This material, unlike raw asbestos, was specifically designed to be incorporated into such products as joint compounds and texture sprays. Further, Union Carbide was aware that using joint compounds and texture sprays, for which SG-210 Calidria was produced, would create respirable dust and thus be a more likely cause of both asbestosis and mesothelioma. Aubin presented expert testimony that opined

exposure to respirable Calidria fibers causes mesothelioma. This evidence was sufficient to permit the jury to make the determination pertaining to causation.

Because we conclude that Aubin presented sufficient evidence to avoid a directed verdict on causation, the Third District erred as a matter of law in taking this issue away from the jury. See Cox v. St. Josephs Hosp., 71 So. 3d 795, 800-01 (Fla. 2011).

### III. Whether the Third District Erred in Determining that Union Carbide Was Entitled to Jury Instructions on Failure to Warn End Users

In the final issue, Aubin asserts that the Third District erred in determining that Union Carbide was entitled to a new trial based on a jury instruction pertaining to its duty to warn the end user and the failure to instruct on the learned intermediary defense. In analyzing this issue, we first review the learned intermediary defense and determine that Union Carbide could present this defense to the jury. We then consider whether the trial court erred in failing to give the proposed instruction on the learned intermediary defense and determine that the trial court did not err because the requested jury instruction pertaining to this defense was misleading. We conclude that granting a new trial on this issue was error.

### A. Union Carbide's Duty to Warn and the Learned Intermediary Doctrine

Both Aubin and Union Carbide requested special instructions based on the fact that Union Carbide supplied its asbestos product to intermediary

- 45 -

manufacturers, which used the asbestos to produce the final products, such as joint compounds, purchased by the end users. The parties disagreed, however, on the state of the law regarding the duty to warn end users, and each submitted proposed jury instructions pertaining to the duty to warn. Aubin requested the trial court to include a general instruction that Union Carbide had the duty to warn the end user, while Union Carbide asserted that it was entitled to an instruction pertaining to the learned intermediary defense and whether Union Carbide had fulfilled its duty to warn by warning the intermediaries as to the dangers.

As correctly stated in Kavanaugh, Union Carbide "as a bulk supplier of asbestos, had a duty to warn of the danger of its product." Kavanaugh, 879 So. 2d at 44. "Under the Second Restatement, [Union Carbide] is liable if it knowingly placed a dangerous product on the market, the dangerous condition of which is unnoticeable, and failed to properly warn of the dangerous condition." Id. The manufacturer may be able to rely on an intermediary to relay the warnings to the end user but the intermediary must be "learned"; that is, "one who has knowledge of the danger and whose position vis-a-vis the manufacturer and consumer, confers a duty to convey the requisite warnings to the consumer." Kavanaugh, 879 So. 2d at 44 (quoting Brito v. Cty. of Palm Beach, 753 So. 2d 109, 111 n.1 (Fla. 4th DCA 1998)). However, as the Third District has recognized, the "learned intermediary doctrine" is not a complete defense and explained that the "intermediary's level of

- 46 -

education, knowledge, expertise, and relationship with the end-users is informative, but not dispositive, on the issue of whether it was reasonable for the manufacturer to rely on that intermediary to relay the warning to end users." Aubin, 97 So. 3d at 900.

The Second and Third Restatements both recognize that a manufacturer may be able to rely on an intermediary to relay warnings to the end user, but the critical inquiry is whether the manufacturer was reasonable in relying on the intermediary to fully warn the end user and whether the manufacturer fully warned the intermediary of the dangers in its product. The Second Restatement sets forth a list of non-exclusive factors: "Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them (see § 291), and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result." Restatement (Second) of Torts § 388 cmt. n (1965). The Third Restatement likewise states, "The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility

and effectiveness of giving a warning directly to the user." See Restatement

(Third) of Torts: Prod. Liab. § 2, cmt. i (1998).

Further, in certain instances, warnings from a supplier to a manufacturer

alone are insufficient, as explained in the Second Restatement:

> If, however, the third person is known to be careless or inconsiderate or if the purpose for which the chattel is to be used is to his advantage and knowledge of the true character of the chattel is likely to prevent its being used and so to deprive him of this advantage—as when goods so defective as to be unsalable are sold by a wholesaler to a retailer—the supplier of the chattel has reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character. In such a case, the supplier may well be required to go further than to tell such a third person of the dangerous character of the article, or, if he fails to do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the chattel. Even though the supplier has no practicable opportunity to give this information directly and in person to those who are to use the chattel or share in its use, it is not unreasonable to require him to make good any harm which is caused by his using so unreliable a method of giving the information which is obviously necessary to make the chattel safe for those who use it and those in the vicinity of its use.

Restatement (Second) of Torts § 388 cmt. l (1965).

Thus, a manufacturer may not be able to reasonably rely on an intermediary

to provide warnings if the manufacturer knows that the necessary warnings would

render the product less valuable and provide an incentive to the intermediary to

withhold the necessary information from the consumer. Likewise, if the

manufacturer, such as Union Carbide, did not adequately convey the danger to the

intermediary or take steps to ensure that the intermediary would adequately warn the end user, a manufacturer may not be reasonable in relying on an intermediary to pass along such a crucial warning to the end user.  The reasonableness of a manufacturer's reliance on an intermediary to convey the warnings to the end user is also impacted by the dangerousness of the product.  In general, the greater the harm that the end user would be subjected to if proper warnings are not given, the less reasonable a manufacturer will be in relying on an intermediary to ensure that the warnings are fully and adequately communicated to the end user.  See Restatement (Second) of Torts § 388 cmt. l (1965) ("[I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information to even a person whom he has good reason to believe to be careful.").

In this case, the Third District concluded that under both the Second and Third Restatements, "the determination as to whether a bulk supplier may rely on an intermediary to warn end users is a question reserved for the trier of fact." Aubin, 97 So. 3d at 900.  However, the Third District held that the trial court did not adequately inform the jury about the learned intermediary defense and further observed that the trial court may have relied on the decision in McConnell, which incorrectly concluded that the learned intermediary defense "is not applicable to

- 49 -

Calidria Asbestos and Ready-Mix with its hidden measure of asbestos." <u>Aubin</u>, 97

So. 3d at 904 n.6 (quoting <u>McConnell</u>, 937 So. 2d at 156).

The Third District explained the error in <u>McConnell</u>, which was based upon

a flawed reading of the decision in <u>Kavanaugh</u>:

> The <u>Kavanaugh</u> court concluded that it was for the jury to weigh
> whether the warnings provided to the manufacturer who integrated
> Union Carbide's product were adequate and whether Union Carbide
> discharged its duty to end users. It also appears that the <u>McConnell</u>
> court may have transformed the affirmation of the jury's
> determination in <u>Kavanaugh</u> into a legal holding to be applied in all
> future cases involving Calidria asbestos. Because such a holding
> would effectively preclude Union Carbide from litigating against
> future plaintiffs as to whether its reliance on intermediaries was
> reasonable, it comes perilously close to application of non-mutual,
> offensive collateral estoppel, which is impermissible in Florida.

<u>Aubin</u>, 97 So. 3d at 904. We agree that in <u>McConnell</u>, the Fourth District

erroneously went farther than <u>Kavanaugh</u> and failed to recognize that determining

whether the duty to warn the end user can be discharged by warning the

intermediary was a jury question. We therefore agree with the Third District that

the learned intermediary defense is a doctrine that a manufacturer can use to argue

to the jury that its duty to warn was fulfilled, provided that the evidence supports

that defense and the jury instruction accurately explains the factors for the jury to

consider in determining whether the manufacturer's reliance was reasonable. We

disapprove of <u>McConnell</u> to the extent that it is inconsistent with our opinion here.

- 50 -

The Third District further concluded that because of the erroneous reliance on McConnell, the jury was not fully instructed on the learned intermediary defense and thus Union Carbide was entitled to a new trial in order to present its defense. Accordingly, we analyze whether the jury instructions given in this case amount to reversible error and thus mandate a new trial.

## B. Whether the Trial Court Erred in Instructing the Jury in this Case

Generally, the applicable standard jury instructions are presumed correct and should be given unless such instructions are erroneous or inadequate. See, e.g., Moss v. Kountry Kitchen of Key Largo, Inc., 952 So. 2d 558, 559 (Fla. 3d DCA 2007); McConnell, 937 So. 2d at 153; Freeman v. State, 761 So. 2d 1055, 1071 (Fla. 2000) ("The standard jury instructions are presumed to be correct."). In this case, however, standard jury instructions did not exist pertaining to the failure to warn, so the parties proposed their own specific instructions.[8]

---

8. At the time of the trial, there were no standard instructions on failure to warn, and the instruction now approved for use by this Court does not address the issue of products distributed through intermediaries:

403.8 STRICT LIABILITY FAILURE TO WARN

A product is defective when the foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

NOTES ON USE FOR 403.8

A party is entitled to have the jury instructed on the theory of its case when the evidence supports that theory. See OB/GYN Specialists of Palm Beaches, P.A. v. Mejia, 134 So. 3d 1084, 1091 (Fla. 4th DCA 2014); Barkett v. Gomez, 908 So. 2d 1084, 1086 (Fla. 3d DCA 2005). To demonstrate that the trial court erred in failing to give a requested jury instruction, a party must show "the requested instruction contained an accurate statement of the law, the facts in the case supported a giving of the instruction, and the instruction was necessary for the jury to properly resolve the issues in the case." Barkett, 908 So. 2d at 1086; see also Force, 879 So. 2d at 106; Smith v. Hugo, 714 So. 2d 467, 468 (Fla. 4th DCA 1998).

---

1. The following cases recognize strict liability for a failure to warn of defects. Union Carbide Corp. v. Aubin, 97 So. 3d 886, 898 (Fla. 3d DCA 2012); McConnell v. Union Carbide Corp., 937 So. 2d 148, 151-52 (Fla. 4th DCA 2006); Union Carbide Corp. v. Kavanaugh, 879 So. 2d 42, 45 (Fla. 4th DCA 2004); Scheman-Gonzalez v. Saber Manufacturing Co., 816 So. 2d 1133 (Fla. 4th DCA 2002); Ferayorni v. Hyundai Motor Co., 711 So. 2d 1167 (Fla. 4th DCA 1998).

2. When strict liability and negligent failure to warn claims are tried together, to clarify differences between them it may be necessary to add language to the strict liability instruction to the effect that a product is defective if unreasonably dangerous even though the seller has exercised all possible care in the preparation and sale of the product. Restatement (Second) Torts, § 402A(2)(a).

In re Std. Jury Instr. in Civ. Cases—Report No. 13-01, 160 So. 3d at 875.

In determining whether an erroneous jury instruction amounts to reversible error, the appellate court must assess whether the instruction reasonably might have misled the jury. See McPhee v. Paul Revere Life Ins. Co., 883 So. 2d 364, 368 (Fla. 4th DCA 2004) ("[T]he test for reversible error arising from an erroneous jury instruction is not whether the instruction misled, but only whether it reasonably might have misled the jury."); Jacobs v. Westgate, 766 So. 2d 1175, 1180 (Fla. 3d DCA 2000) ("Reversal is required where a jury might reasonably have been misled, regardless of whether it has actually been misled."). To properly preserve this error, there must be a timely, specific objection to the jury instruction. See Feliciano v. Sch. Bd. of Palm Beach Cty., 776 So. 2d 306, 308 (Fla. 4th DCA 2000); City of Orlando v. Birmingham, 539 So. 2d 1133, 1134-35 (Fla. 1989).

In this case, Aubin and Union Carbide each requested a special jury instruction based on the fact that Union Carbide supplied its asbestos product to separate third-party intermediaries that produced the final products sold to the end users, such as joint compounds. Aubin requested the trial court to include an instruction that Union Carbide had the duty to warn the end user, relying on McConnell from the Fourth District. This special jury instruction stated: "An asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end users of an unreasonable danger in the contemplated use of its products."

- 53 -

Union Carbide objected to this instruction because it did not recognize the learned intermediary defense or provide the jury with the factors that the jury should consider in determining whether Union Carbide fulfilled its duty to warn. Union Carbide tendered its own instructions regarding the factors that the jury could consider when applying the learned intermediary defense:

> In considering what constitutes reasonable care in connection with William Aubin's failure to warn claim, your consideration may include, but is not limited to, the following factors:
>
> - the warnings Union Carbide provided to its customers who used Union Carbide's asbestos in making joint compound or ceiling sprays,
> - whether Union Carbide asbestos customers were aware of the dangers involving asbestos,
> - whether Union Carbide had access to joint compound and ceiling spray end customers, and
> - whether Union Carbide had the ability to require customers to give specific warnings to users of the products incorporating Union Carbide's asbestos.

After considering both parties' proposed instructions, the trial court determined that Aubin's proposed instruction on the duty to warn should be given and rejected Union Carbide's proposed instructions. The jury ultimately attributed 46.25% of the fault to Union Carbide and apportioned the remaining 53.75% to several intermediaries listed on the verdict form. The Third District, however, held that while Aubin's requested special instruction on the duty to warn that the trial court gave was "technically accurate," it was misleading standing alone because it

failed to inform the jury that a manufacturer could discharge its duty to warn by reasonably relying on a learned intermediary. Aubin, 97 So. 3d at 902.

After examining the record and comparing the cases in support of the proposed jury instructions with the proposed instructions themselves, we reject Union Carbide's argument that the trial court committed reversible error in failing to instruct on this theory. The special jury instructions requested by Union Carbide did not provide an accurate statement of the law as to this defense. In order to show that the trial court erred in failing to give its requested jury instruction, Union Carbide must show "the requested instruction contained an accurate statement of the law, the facts in the case supported a giving of the instruction, and the instruction was necessary for the jury to properly resolve the issues in the case." Barkett, 908 So. 2d at 1086.

This Union Carbide has not done. In fact, some of the factors that Union Carbide proposed are directly contrary to principles of law established in other asbestos litigation and in the cases that the proposed jury instructions relied upon. For example, one of the factors proposed by Union Carbide was whether the intermediaries were aware that asbestos is dangerous. However, as the Fourth District correctly recognized in McConnell, 937 So. 2d at 154, a jury would be reasonably misled by such a jury instruction that strongly implies that a learned intermediary's specific knowledge about a defect, rather than the end user's

knowledge, is the focus of Florida's strict liability law. Likewise, the factor that the jury should consider whether Union Carbide had access to the learned intermediary's customers is misleading, as neither the caselaw nor the Second Restatement have recognized that manufacturers must have direct access to the end user. See id. at 156 (recognizing that a manufacturer can require a learned intermediary to adopt a particular means of disclosure to ensure the end user will be adequately warned); Restatement (Second) of Torts § 388 cmt. l (1965) (recognizing that where the manufacturer has reason to suspect that the learned intermediary will not pass necessary warnings to the end user, the manufacturer "takes[s] the risk of being subjected to liability if the information is not brought home to those whom the [manufacturer] should expect to use the chattel'").

As we have explained, both the Second and Third Restatements provide that the learned intermediary defense permits a manufacturer to rely on an intermediary to relay warnings to the end user, provided that reliance is reasonable, based on the following nonexclusive factors: the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate end user, and the feasibility and effectiveness of directly warning the end user. Union Carbide's proposed instructions did not clearly address these factors and in fact were misleading in this regard.

"When non-standard instructions are proposed, trial courts face an analytical task similar in kind to that performed by the thirty-two member Florida Standard Jury Instructions Committee—without the luxury of time." R.J. Reynolds Tobacco Co. v. Jewett, 106 So. 3d 465, 469 (Fla. 1st DCA 2012). Thus, non-standard proposed instructions must be legally accurate and factually relevant. Id.

A party cannot complain on appeal that a trial court committed reversible error by failing to correct that party's own inaccurate and misleading proposed instructions. In fact, permitting parties to raise such issues on appeal would invite parties to deliberately propose inaccurate instructions so that such a party could either complain that the trial court committed reversible error in failing to correct the error or that the trial court erred in how it corrected the inaccurate instructions. Since Union Carbide's proposed jury instructions did not contain an accurate statement of the law, the trial court did not err in failing to give these instructions.

After reviewing the jury instructions as a whole, we conclude that the instructions given by the trial court were not misleading. Although special jury instructions could be fashioned to explain the learned intermediary defense, the absence of these instructions did not render the jury instructions as a whole erroneous. This is especially so because the special instructions requested by

Union Carbide were in themselves misleading and not an accurate statement of the learned intermediary defense.

Given the instructions that the jury was provided, the actual findings of the jury that apportioned fault to several of the intermediaries, and the arguments of counsel, as well as the failure of Union Carbide to provide accurate jury instructions on the learned intermediary defense, we conclude that no reversible error occurred. Accordingly, while we disapprove McConnell to the extent it could be read as determining as a matter of law that the duty to warn end users can never be satisfied by reasonably relying on a warning to a learned intermediary, we nevertheless conclude that there is no basis for finding reversible error in this case.

**CONCLUSION**

For the reasons set forth in this opinion, we hold that the Third District erred in determining that the Third Restatement's test for a defective design exclusively applied to a claim of strict products liability, which generally requires plaintiffs to establish a reasonable alternative of how a product could be designed. We reaffirm our adherence to the Second Restatement and the consumer expectations test, which we first adopted in West. We further hold that the Third District erred in determining that Union Carbide was entitled to a directed verdict on the design defect claim because the Third District improperly conflated the design defect prong with causation. As to the jury instruction claim on the failure to warn, while

we conclude that the Third District correctly set forth the law regarding the learned intermediary defense, we disagree with the Third District's conclusion that a new trial is required. We hold that the jury instructions actually given by the trial court were not misleading and that the trial court did not err in rejecting Union Carbide's proposed jury instructions, which inaccurately discussed the learned intermediary defense.

Thus, we quash the Third District's decision and also disapprove of the Third District's prior cases of Kohler, 907 So. 2d 596, and Agrofollajes, 48 So. 3d 976, as to the adoption and application of the Third Restatement. We further disapprove the Third District's conclusion that no defective design was demonstrated because Aubin failed to show causation. As to the failure to warn claim, we agree with the Third District's discussion of the learned intermediary defense, which is in accordance with the Fourth District's decision in Kavanaugh. To the extent that the Fourth District's opinion in McConnell could be construed to disallow any special instruction on the learned intermediary defense, we disapprove that portion of the McConnell opinion. In sum, we conclude that the Third District erroneously reversed the final judgment and remand this case to the Third District with directions that the judgment be reinstated.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., dissenting.

I agree with the Third District Court of Appeal that Union Carbide is entitled to a new trial since the jury instruction on Aubin's failure to warn claims—namely, "[a]n asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end users of an unreasonable danger in the contemplated use of its products"—was misleading. As the Third District explained, this instruction failed to inform the jury about the learned intermediary defense, which permits Union Carbide to "discharge[] its duty [to warn] by adequately warning the intermediary manufacturers [to whom Union Carbide sold its asbestos] and reasonably relying on them to warn end-users" about the dangers of the asbestos the intermediaries incorporated into the products they manufactured and sold to end users like Aubin. Union Carbide Corp. v. Aubin, 97 So. 3d 886, 902 (Fla. 3d DCA 2012). In so doing, the trial court improperly permitted the jury to find Union Carbide liable simply because Union Carbide did not directly warn Aubin about the dangers of asbestos. Therefore, I respectfully dissent.

The trial court refused to instruct the jury on the learned intermediary defense based on the Fourth District Court of Appeal's holding in McConnell v.

- 60 -

Union Carbide Corp., 937 So. 2d 148, 156 (Fla. 4th DCA 2006), that this defense "is not applicable to Calidria Asbestos and Ready-Mix with its hidden measure of asbestos," meaning "a supplier in the shoes of [Union] Carbide may not reasonably rely on an intermediary, no matter how learned it might be deemed." However, as the majority explains, McConnell does not accurately state Florida law, which accepts the learned intermediary defense as a viable defense to the negligent and strict liability failure to warn claims alleged in this case. Further, as the majority holds, it is for the jury to decide whether it is reasonable under the circumstances for a supplier or manufacturer to rely on an intermediary to warn the end user regarding the dangerousness of the product at issue.

Notwithstanding these conclusions, the majority holds that Union Carbide is not entitled to a new trial in which it will have the benefit of a jury instruction on the learned intermediary defense because, in the majority's view, Union Carbide failed to request an instruction that included "an accurate statement of the law as to this defense." Majority op. at 55. The record belies the majority's holding.

During the charge conference, Union Carbide objected to the instruction that it had a duty to directly warn end users, arguing that this instruction, standing alone, was misleading. Union Carbide argued that this instruction is "not a correct statement of the law[, and] basically say[s] game, set, match, if Union Carbide didn't warn Mr. Aubin, you should find for Mr. Aubin." Union Carbide further

argued that "there are other factors that the jury should take into consideration" in determining whether it satisfied its duty to warn.

Specifically, Union Carbide proposed jury instructions modeled after both the Second and Third Restatements of Torts and requested that these instructions be given in lieu of, or at least in addition to, the general instruction stating that Union Carbide had a duty to warn end users. One of these proposed instructions stated that, "[i]n considering what constitutes reasonable care in connection with [the] failure to warn claim, [the jury's] consideration may include, but is not limited to[:] the warnings Union Carbide provided to its customers who used Union Carbide's asbestos in making joint compound or ceiling sprays," "whether Union Carbide asbestos customers were aware of the dangers involving asbestos," "whether Union Carbide had access to joint compound and ceiling spray end customers," and "whether Union Carbide had the ability to require customers to give specific warnings to users of the products incorporating Union Carbide's asbestos."

In holding that Union Carbide's efforts were insufficient to preserve its right to have the jury instructed on the learned intermediary defense, the majority singles out two of Union Carbide's proposed factors as inaccurate statements of the law. First, the majority takes issue with the factor of "whether Union Carbide asbestos customers [(the intermediaries)] were aware of the dangers involving asbestos,"

suggesting that this factor improperly focuses on what the intermediary, rather than the end user, knew about the dangers of the product. However, the intermediary's knowledge that the product is in fact dangerous is necessary for the intermediary to pass on the proper warnings to end users and, therefore, entirely relevant to the learned intermediary defense. See Union Carbide, 97 So. 3d at 899 (explaining that "the intermediary's education, knowledge, expertise, and relationship with end-users bear heavily on the reasonableness of a manufacturer relying on that intermediary to relay warnings to the end-users") (emphasis added).

Further, Union Carbide's proposed instructions do not suggest that the mere fact its intermediaries knew about the dangers of asbestos was sufficient, in and of itself, to discharge Union Carbide's duty to warn. To the contrary, Union Carbide also proposed that the jury should consider the actual "warnings Union Carbide provided to its customers who used Union Carbide's asbestos in making joint compound or ceiling sprays." This factor is directly in line with Florida law that it is "for the jury to determine the adequacy of [Union Carbide's] warnings to [the intermediary] and whether, based on the sufficiency of the warnings given, [Union Carbide] still owed [the end user] a duty." Union Carbide Corp. v. Kavanaugh, 879 So. 2d 42, 45 (Fla. 4th DCA 2004).

Next, the majority faults Union Carbide for proposing that the jury should factor "whether Union Carbide had access to joint compound and ceiling spray end

- 63 -

customers" into its analysis because, in the majority's view, it improperly requires that Union Carbide "must have direct access to the end user." Majority op. at 56. However, the majority wrongly reads this proposed factor to say something it plainly does not. Nothing about this factor suggests that Union Carbide could somehow avoid its duty to warn simply because it lacks access to the end users. Rather, this factor suggests that it would probably be more reasonable for Union Carbide to rely on intermediaries who know about the dangers of its asbestos to warn end users if the intermediaries had greater access to the end users than Union Carbide, but less reasonable if Union Carbide's access was basically the same as the intermediaries' access. Indeed, as the majority acknowledges, Florida law defines a learned intermediary as "one who has knowledge of the danger and whose position vis-a-vis the manufacturer and consumer, confers a duty to convey the requisite warnings to the consumer." Majority op. at 46 (emphasis added) (quoting Kavanaugh, 879 So. 2d at 44).

Moreover, the Third Restatement specifically lists "the feasibility and effectiveness of giving a warning directly to the user" among the factors relevant to the learned intermediary defense. Restatement (Third) of Torts: Prod. Liab. § 2 cmt. i (1998). Though the majority declines to adopt the Third Restatement, this holding is of no moment where the learned intermediary defense is concerned because, as the majority expressly recognizes, "[t]he Second and Third

Restatements both recognize that a manufacturer may be able to rely on an intermediary to relay warnings to the end user," and as the majority opinion indicates, both Restatements rely upon basically the same factors in determining whether a manufacturer can reasonably rely on the intermediary and thereby can discharge its duty to warn an end user.  Majority op. at 47; see also Union Carbide, 97 So. 3d at 904 ("[B]ecause the jury instructions did not inform the jury that Union Carbide could have discharged its duty to warn end-users by adequately warning the intermediary manufacturers, and reasonably relying on them to warn end-users, they were misleading under both the Third Restatement and the Second Restatement.").

While it is unclear from the majority's opinion what magic words Union Carbide should have used to preserve its right to an instruction on the learned intermediary defense (especially since—as the majority also acknowledges—there are no standard jury instructions on this defense), it is clear from the record that Union Carbide asked that the jury be instructed on the learned intermediary defense and proposed jury instructions that included several non-exhaustive factors that would have been appropriate for the jury to consider in assessing whether it was reasonable under the circumstances for Union Carbide to rely on its intermediaries to warn end users.  It is further clear that the facts supported the application of the learned intermediary defense and that a jury instruction on this

defense was necessary to properly resolve Aubin's failure to warn claims since, without this instruction, the jury might have reasonably been misled into concluding that it had to find Union Carbide at fault simply because Union Carbide did not directly warn end users.[9] See R.J. Reynolds Tobacco Co. v. Jewett, 106 So. 3d 465, 467 (Fla. 1st DCA 2012) ("A trial court abuses its discretion when it fails to give a proposed instruction that is (1) an accurate statement of the law, (2) supported by the facts of the case, and (3) necessary for the jury to properly resolve the issues, so long as the subject of the proposed instruction is not covered in other instructions given to the jury and the failure to instruct is shown to be prejudicial."); see also McPhee v. The Paul Revere Life Ins. Co., 883 So. 2d 364, 368 (Fla. 4th DCA 2004) (explaining that an erroneous jury instruction constitutes reversible error where the instruction "reasonably might have misled the jury").

Accordingly, because the jury instructions on Aubin's failure to warn claims were misleading and because it is impossible to tell from the jury's verdict whether

---

9. The fact that the jury allocated fault to some of Union Carbide's intermediaries does not, as the majority suggests, establish the jury instructions were not misleading. Over Union Carbide's objection, the verdict form did not separate the theories of liability, making it impossible to tell why the jury found Union Carbide liable or why it attributed fault in the manner it did. In fact, the jury's allocation of over half of the fault to intermediaries could just as easily suggest that the jury rendered a plaintiff's verdict because it believed it had to find Union Carbide at fault solely because Union Carbide did not directly warn end users.

the jury's finding that Union Carbide "place[d] products on the market with a defect which was the legal cause of damage to [Aubin]" applies to Aubin's design defect claim, warning defect claim, or both, Union Carbide is entitled to a new trial. I respectfully dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal - Direct Conflict of Decisions

      Third District - Case No. 3D10-1982

      (Miami-Dade County)

James Louis Ferraro and Juan Pablo Bauta, II of The Ferraro Law Firm, P.A., Miami, Florida,

      for Petitioner

Matthew John Conigliaro of Carlton Fields, P.A., Tampa, Florida, and Dean Angelo Morande of Carlton Fields, P.A., West Palm Beach, Florida,

      for Respondent

Philip Mead Burlington of Burlington & Rockenbach, P.A., West Palm Beach, Florida, and Larry Scott Stewart of Stewart Tilghman Fox Bianchi & Cain, P.A., Miami, Florida,

      for Amicus Curiae Florida Justice Association

Gary M. Farmer of Farmer Jaffe Weissing Edwards Fistos & Lehrman, Fort Lauderdale, Florida,

      for Amicus Curiae Florida Consumer Action Network

Christina Marie Martin, Palm Beach Gardens, Florida,

    for Amicus Curiae Pacific Legal Foundation

Frank Cruz-Alvarez of Shook Hardy & Bacon L.L.P., Miami, Florida,

    for Amici Curiae The Chamber of Commerce of the United States of
    America, Coalition for Litigation Justice, Inc., Pharmaceutical Research and
    Manufacturers of America, and American Chemistry Council